UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CRIMINAL ACTION NO. 3:22-CR-00085

UNITED STATES OF AMERICA                                    PLAINTIFF

v.

KYLE MEANY, *et al*                                         DEFENDANTS

## MEMORANDUM OPINION AND ORDER

In the wake of the FBI's investigation into the death of Breonna Taylor, federal grand juries returned indictments against certain city police officers who were involved in obtaining and executing a no-knock search warrant for Taylor's Louisville, Kentucky apartment – a search which tragically ended with Taylor's death. The instant criminal action concerns the Indictment returned against Kyle Meany and Jason Jaynes, two former Louisville-Metro police officers who played roles in obtaining the search warrant. Essentially, the charges allege that police lacked probable cause for the search, so Jaynes and Meany lied in order to obtain the warrant. The charges also allege that during the FBI's investigation of the events, Jaynes tried to cover up his wrongdoing with more lies and Meany lied about who was responsible for seeking no-knock authority. These principal allegations are found in a four-count Indictment.

Count One charges Jaynes and Meany with aiding and abetting a violation of Taylor's Fourth Amendment right to be free from an unreasonable search. The charges are brought pursuant to 18 U.S.C. § 2(b) and § 242. Section 2(b) is an aiding-and-abetting statute, and § 242 criminalizes the deprivation of someone's civil rights by a state actor. Section 242 contains three offenses, one misdemeanor and two felonies. Jaynes and Meany have been charged with all three.[1] Count Two charges Jaynes with a cover-up. Specifically, Count Two alleges that Jaynes and fellow officer

---

[1] Indictment, DN 1 at PageID# 3 (Count One).

"K.G." met and ultimately agreed to give the FBI a "false story" because "they could both go down for putting false information" into the affidavit for the search warrant.[2] Count Two also alleges that Jaynes and K.G. falsified a letter to the FBI to cover their tracks.[3] Count Two charges Jaynes with violating 18 U.S.C. § 1512, § 1519 and § 371. Count Three alleges that Jaynes used the falsified letter to impede the FBI's investigation,[4] and charges him with violating § 1519. Count Four is against Meany.  It alleges that during an FBI interview, Meany lied when he said that the SWAT Unit of the Louisville Metro Police Department (the "LMPD") asked for a no-knock warrant. Count Four charges Meany with violating 18 U.S.C. § 1001.[5]

This matter is now before the Count on the defendants' motions to dismiss. Meany has moved to partially dismiss Count One, attacking only the felony charges. *See* DN 33. He has also moved to completely dismiss Count Four. *See* DN 34. Jaynes has moved to dismiss all Counts against him but has also moved to dismiss the felony offenses in Count One as alternative relief on that charge. *See* DN's 35, 36 and 37. The United States has opposed the motions. *See* DN's 40, 41, 42 and 43. Defendant Meany has filed replies (DN's 47 & 48), and the time for replies has now expired. Accordingly, the motions are ripe for review. After careful consideration and for the reasons set out below, the Court will grant Meany's Motion to partially dismiss Count One (DN 33) and will also grant Jaynes' Motion to dismiss Count One to the extent he seeks to dismiss the felony charges. The Court will deny Jaynes' Motion for a complete dismissal of Count One (DN 35). The Court will also deny the remaining Motions to Dismiss (DN's 34, 36 and 37).

---

[2] *Id.* at PageID# 7 (¶¶ 7-8).
[3] *Id.* at PageID# 6 (¶ 5).
[4] *Id.* at PageID# 7-8.
[5] *Id.* at PageID# 8.

## **BACKGROUND**

The Indictment alleges that the LMPD was conducting a drug investigation which targeted "J.G.," a known dealer. In connection with that investigation, the PBI Unit[6] identified five apartments they wanted to search – including Taylor's. However, according to the Indictment, they did not have sufficient facts to establish probable cause to search her apartment. For that reason, Jaynes and Meany allegedly falsified a warrant affidavit, making it appear as though probable cause did exist. The warrant issued and was executed by officers other than Jaynes and Meany. When those officers broke down Taylor's door, her boyfriend ("K.W.") grabbed his gun and shot at them because he thought they were "intruders." Two officers returned fire. One of those rounds hit Taylor in the chest and she died.[7]

Next, the Indictment alleges that Jaynes conspired with "K.G.," a fellow officer, "to cover up the fact" that the warrant  affidavit "was false, misleading, stale and unsupported by probable cause."[8] To achieve this end, according to the Indictment, Jaynes and K.G. agreed to do two things: (1) submit "a false Investigative Letter" and (2) make "false statements to criminal investigators."[9] The Indictment states that on or about May 1, 2020, Jaynes, along with K.G., submitted an "Investigative Letter," purporting to link Taylor to drug dealer J.G.[10] As for the false statements, the Indictment alleges that Jaynes and K.G. agreed to falsely claim that they had information which showed that J.G. was receiving packages at Taylor's apartment.[11] Similarly, in a charge against Jaynes alone, the Indictment alleges that Jaynes knew the falsified May 1, 2020 letter would be used in a federal criminal investigation but submitted it anyway.[12] Lastly, the Indictment alleges

---

[6] "PBI" stands for Place Based Investigations.
[7] Indictment, DN 1 at PageID# 1-3 (¶¶ 2-10).
[8] *Id.* at PageID# 4 (¶ 1).
[9] *Id.*
[10] *Id.* at PageID# 6 (¶ 5).
[11] *Id.* at PageID# 7 (¶ 8).
[12] *Id.* at PageID# 7-8.

that on or about May 17, 2022, Meany lied to a federal agent when he told that agent that the LMPD's SWAT unit had asked for no-knock authority to search Taylor's apartment.[13]

Both Jaynes and Meany have moved to dismiss pursuant to FED. R. CRIM. P. 12(b) for failure to state offenses.

## APPLICABLE STANDARD

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."[14] There are "two constitutional requirements for an indictment: 'first, [that it] contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, [that it] enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"[15] Accordingly, "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'"[16] Additionally, "[t]o be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime."[17] The Court must "accept the factual allegations as true, and construe those allegations in a practical sense with all of the necessary implications."[18] At the same time, the Court's review is not an exercise in evaluating "the evidence upon which the indictment is based."[19] Rather, the court accepts the facts

---

[13] *Id.* at PageID# 8.

[14] FED. R. CRIM. P. 7(c)(1).

[15] *U.S. v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (quoting *Hamling v. U.S.*, 418 U.S. 87, 117 (1974)) (alteration in original).

[16] *Hamling*, 418 U.S. at 117 (quoting *U.S. v. Carll*, 105 U.S. 611, 612 (1882)).

[17] *U.S. v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992) (citing *Fleisher v. U.S.,* 302 U.S. 218 (1937) (per curiam)).

[18] *U.S. v. Reed,* 77 F.3d 139, 140 n. 1 (6th Cir. 1996) (*en banc*).

[19] *U.S. v. Landham*, 251 F.3d 1072, 1080 (6th Cir. 2001) (citing *Costello v. U.S.,* 350 U.S. 359, 362–63 (1956)).

alleged and decides if those facts establish the defendant's commission of the crime. "If the indictment is legally deficient, the proper result is dismissal . . . ."[20]

## ANALYSIS

### I. Count One – The § 242 Offenses and Aiding & Abetting Same

The Government has charged Jaynes and Meany with three violations of 18 U.S.C. § 242. Section 242 criminalizes constitutional-rights violations by state actors. First, the Government asserts that because there was no probable cause for a search of Taylor's apartment, the search was unreasonable in violation of Taylor's Fourth Amendment rights.[21] The Government contends that despite the fact that different police officers (the "Execution Team") conducted the search, Jaynes and Meany remain criminally liable for this rights-violation pursuant to 18 U.S.C. § 2(b) – an aiding and abetting statute. Section 2(b) states: "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."[22] This statute applies in cases where the named defendant has set things in motion but it is the acts of innocent third parties that complete the crime. In this manner, the defendant-causer's intent is joined with the intermediary's act to comprise the crime.[23] If the Government proves its Fourth-Amendment liability theory beyond a reasonable doubt, Jaynes and Meany will each be guilty of a misdemeanor.

Second, relying on the same aiding and abetting theory, the Government has charged Jaynes and Meany with a felony offense, punishable by a maximum term of ten years. This charge is based on the allegation that the Fourth Amendment rights-violation "involved" the use of a dangerous weapon.[24] Third, the Government has charged Jaynes and Meany with another felony,

---

[20] *Id.*

[21] Indictment, DN 1 at PageID# 2 (¶ 7) (". . . the officers lacked probable cause for the search.").

[22] 18 U.S.C. § 2(b).

[23] *U.S. v. Lester*, 363 F.2d 68, 73 (6th Cir. 1966). As a result, the Court's analysis focuses on the crime's elements as opposed to on whether Jaynes or Meany completed all of the acts that comprised the crime.

[24] Indictment, DN 1 at PageID# 3 (Count One).

one that is punishable by a maximum term of life imprisonment. This charge is based on the allegation that the entry without probable cause (a warrantless entry) resulted in Taylor's death.

Defendants contend that the felony charges must be dismissed. They argue that the Government has not alleged and cannot prove that they themselves used a weapon to commit the alleged rights-violation. They also contend that the Government must but cannot prove proximate cause with respect to Taylor's death. Defendants argue that, as a matter of law, K.W.'s decision to open fire on the Execution Team is the legal cause of Taylor's death, its being a superseding cause that severed the causation chain. Further, Jaynes contends that the rights-violation depends upon a finding that probable cause did not exist, a finding that only a court, not a jury, can make. He argues that this requires dismissal of the base offense and thus a complete dismissal of Count One.

The Court begins with the statute.[25] Section 242 reads, in pertinent part:

> Whoever, under color of any law . . . willfully subjects any person . . . to the deprivation of any rights . . . secured or protected by the Constitution . . . shall be fined under this title or imprisoned not more than one year or both;
>
> and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon . . . shall be fined under this title or imprisoned not more than ten years, or both;
>
> and if death results from the acts committed in violation of this section . . . shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.[26]

As written, § 242 establishes three offenses – a misdemeanor base offense and two aggravated felony offenses created by penalty enhancements.[27] This three-part framework reveals two

---

[25] *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) ("in any case of statutory construction, our analysis begins with 'the language of the statute.'") (citation omitted).

[26] 18 U.S.C. § 242.

[27] *See, e.g.*, *U.S. v. Rodella*, 852 Fed. App'x 323, 328 (10th Cir. 2021) (unpublished) (§ 242 has three separate clauses carrying three separate offenses); *U.S. v. Shaw*, 891 F.3d 441, 447 (3d Cir. 2018) (§ 242 contains base offense and two aggravated offenses); *U.S. v. Vizcarrondo-Casanova*, 763 F.3d 89, 98 (1st Cir. 2014) (same); *U.S. v. Holly*, 488 F.3d 1298, 1301-02 (10th Cir. 2007) (same); *U.S. v. Wms.*, 343 F.3d 423, 434 (5th Cir. 2003) (same).

purposes: (1) an intent to deter willful abuses of office that subject someone to a rights-violation[28] and (2) an intent to deter and severely punish governmental actors who commit rights-violations by using violence. Accordingly, § 242 encompasses a police officer's abuse of power when that abuse violates civil rights,[29] when the rights-violation is furthered by violent means, and/or when it results in violent ends, *i.e.*, bodily injury or death. Here, the Government has charged Jaynes and Meany with aiding and abetting all three offenses: (1) depriving Taylor of her Fourth Amendment rights, (2) use of a dangerous weapon and (3) causing Taylor's death. Because Jaynes has moved to dismiss all three charges, the Court must decide whether the Indictment sufficiently states, with supporting facts, both the misdemeanor and the felony offenses.

### A. The Base Offense – Fourth Amendment Violation, Unreasonable Search

The Indictment states a § 242 base offense:  a violation of Taylor's Fourth Amendment right to be free from an unreasonable search. That offense consists of these elements: (1) the willful (2) deprivation of a constitutional right (3) under color of law.[30] Here, the Indictment alleges that the PBI unit of the LMPD was investigating a drug ring and "obtained warrants to search five apartments," including Taylor's.[31] Further, the Indictment alleges that there was no probable cause to search Taylor's apartment;[32] that Jaynes and Meany knew it and lied in the warrant affidavit to cover up that lack;[33] and that LMPD officers "executed the warrant at Taylor's home," and in doing so "broke down the door."[34] These allegations state a prima facie case of subjecting Taylor to an unreasonable search in violation of the Fourth Amendment.

---

[28] *U.S v. McDougle*, 82 Fed. App'x 153, 161 (6th Cir. 2003) (unpublished) (color of law element satisfied when defendant abuses or misuses power he has by virtue of government employment) (citing *U.S. v. Classic*, 313 U.S. 299, 326 (1941) ("Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law.")).

[29] *See Screws v. U.S.*, 325 U.S. 91, 98 (1945) (§ 242 enacted to "'protect all persons in the United States in their civil rights.'") (quoting Cong. Globe, 39th Cong., 1st Sess., p. 211).

[30] *U.S. v. Lanier*, 520 U.S. 259, 264 (1997).

[31] Indictment, DN 1 at PageID# 2 (¶ 6).

[32] *Id.* (¶ 7) (". . . the officers lacked probable cause for the search.").

[33] *Id.* (Jaynes and Meany knew affidavit "contained information that was false [and] misleading").

[34] *Id.* at ¶ 9.

Nevertheless, Jaynes argues that Count One must be dismissed because whether probable cause existed is an issue which only this Court, as opposed to a jury, may decide. Jaynes relies on suppression-hearing cases for his argument and misses the mark as a result. "While probable cause is a question for the judge to decide when it arises in a motion to suppress, it is a question for the jury when it is an element of the crime."[35] Here, whether probable cause for the search existed is an element of the crime. Indeed, the alleged Fourth Amendment rights-violation hinges on the alleged lack of probable cause. The Government cannot prove that the search violated the Fourth Amendment without proving that the Execution Team did not have probable cause to enter. In turn, without proof of the alleged rights-violation, the Government cannot prove that either Jaynes or Meany violated § 242. Thus, whether probable cause existed is elemental to the alleged crime in this case, making it a question for the jury.[36] For this reason, Jaynes' motion for complete dismissal of Count One will be denied.

### B. The First Felony Offense – Use of a Dangerous Weapon (the "Use Charge")

Dismissal of the Use Charge is warranted. As previously explained, § 242 proscribes using a dangerous weapon to subject someone to the deprivation of a constitutional right. Not just any use will do. Instead, the defendant must have used a weapon to achieve his end.[37] Here, the Indictment alleges that Taylor was subjected to a deprivation of her Fourth Amendment right to be free from an unreasonable search. Thus, to convict Jaynes and Meany of aiding and abetting the use of a dangerous weapon to commit this crime, the Government must prove that the Execution Team used their firearms for the purpose of subjecting Taylor to the search. The Indictment does not do so. Instead, the Indictment does no more than allege that Jaynes and Meany knew the Execution

---

[35] *U.S. v. Dukes*, 779 Fed. App'x 332, 334 (6th Cir. 2019) (unpublished) (citing *U.S. v. Gaudin*, 515 U.S. 506, 521 (1995)).
[36] *Id.*
[37] *See, e.g.*, *U.S. v. Acosta*, 470 F.3d 132, 135-36 (2nd Cir. 2006) (officer's use of gun to rob drug dealers).

Team would be armed. Simply possessing a firearm, however, is not "use" under § 242.[38] Instead, "use" means actively employing a weapon. The only active employment of a weapon alleged in the Indictment is "use" for self-defense, *i.e.,* returning K.W.'s fire. There are no allegations which suggest that the Execution Team used their guns to subject Taylor to the search. The Use Charge will be dismissed for this reason.

### 1. The Meaning of "Use" under § 242

Section 242's three goals, its syntax and the ordinary meaning of "use" make clear that "use" of a weapon under § 242 means active employment for the purpose of facilitating a federal-right violation. First, § 242 has a three-part agenda: (1) to punish government actors who deprive others of federal rights; (2) to more harshly punish those actors who use violent means to do so; and (3) to more harshly punish those actors whose conduct yields violent ends, *i.e.,* bodily injury or death. This framework reveals that an offender can commit a rights-violation without exposing himself to the harsher penalties, that is, without violent means or ends.[39] Doing so is a misdemeanor:

> (1) Whoever, under color of any law . . . willfully subjects any person . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . shall be fined under this title or imprisoned not more than one year, or both . . . .[40]

If, however, the offender uses violence or causes bodily injury or death, then as a result of the penalty enhancements which comprise § 242's second and third clauses, he commits a felony:

> (2) . . . if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and

---

[38] Defendants contend that the dangerous-weapon charge must be dismissed because neither of them used a weapon. This argument ignores the aiding and abetting theory of liability. Under § 2(b), it is not necessary that the defendants used a weapon, so long as one of the officers executing the warrant used one to further the search. However, Defendants are correct that the Indictment must include an allegation that a weapon was used to further the crime, and it does not do so. So the motion to dismiss prevails, just not for the discrete ground relied on by Defendants.

[39] That is, a deprivation of a federal right need not be accompanied by violence to be punishable. *U.S. v. Calhoun*, 726 F.2d 162, 163 (4th Cir. 1984); *U.S. v. Ramey,* 336 F.2d 512, 514 (4th Cir. 1964). *See also, e.g., U.S. v. Senak,* 477 F.2d 304, 308 (7th Cir. 1973) (public defender who extracted fees from indigent clients); *U.S. v. Davila*, 704 F.2d 749 (5th Cir. 1983) (border guards who coerced sexual favors).

[40] 18 U.S.C. § 242.

> (3) if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.[41]

Plainly, § 242 is comprised of a misdemeanor base offense and two felonies – one felony punishable by a maximum ten years' imprisonment and the second punishable by life imprisonment or even a death sentence. As the seriousness of the violent means and/or results escalate in degree, so do the penalties. Taken together, the statute evinces an intent to more harshly punish governmental actors who abuse their power and use violence in doing so. Yet, the statute also recognizes that a rights violation may be committed without using a violent means to achieve that unlawful end. Further, Congress found it appropriate to punish such crimes as misdemeanors.

In light of these purposes and intent, it becomes apparent that one can violate the first clause of § 242 without violating the second or third clause. Stated another way, "[t]he law establishes . . . that a prosecution for deprivation of rights does not depend upon death or serious physical injury to the victim."[42] The same is true when the defendant is an armed police officer. Thus, "use" of a dangerous weapon under § 242 must mean more than mere possession. Indeed, the Second and Tenth Circuits have reached this same conclusion.[43] The Second Circuit reasoned:

> we note that an on-duty police officer's mere act of carrying a service weapon in accordance with police policy does not equate with "the use, attempted use, or threatened use of a dangerous weapon." This is true even if the officer is engaged in conduct that violates another's constitutional rights-for example, making an arrest at a protest that is subsequently found to violate the First Amendment, or impounding a car in violation of due process. To suggest otherwise would unjustifiably convert every violation

---

[41] *Id.*

[42] *Calhoun*, 726 F.2d at 163; *see also Screws*, 325 U.S. at 104 ("specific intent required by the Act is an intent to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them.").

[43] Neither the United States Supreme Court nor the Sixth Circuit Court of Appeals has opined on the meaning of "use" under § 242.

of the first clause of § 242 by a police officer into a violation of the second clause.[44]

The Tenth Circuit has also rejected the assertion that simply being armed is "use" under § 242:

> Nevertheless, Rodella contends that the word "use" in § 242 somehow indicates that the offense can be committed merely by possessing a weapon, without any threat of violent force. The district court rejected this argument, finding that "use" connotes active employment of a firearm. Indeed, the common definition of "use" is "[t]o employ for the accomplishment of a purpose." . . . And § 242's plain terms require, as relevant here, that the "acts" involving the deprivation of rights "include the use . . . or threatened use of a dangerous weapon." Mere possession of a dangerous weapon is not consistent with the common definition of "use," the jury instructions in this case, or § 242's language.[45]

The Court agrees with these rationales. Indeed, Black's Law Dictionary defines "use" as "to employ for the accomplishment of a purpose."[46] Accordingly, given the ordinary meaning of use as well as § 242's structure, this Court holds that to be guilty of the first felony offense, a police officer must have actively employed a weapon as a means of achieving the alleged rights-violation. That is, he must have used the weapon to commit the base offense as opposed to having used a weapon for a different purpose. Thus, to state a prima facie case for a Use Charge, an Indictment must allege as much. Here, the Indictment falls short.

### 2. The Indictment's Failure to Charge "Use" under § 242

Instead of clearly stating a Use Charge, the Indictment muddies the waters, injecting ambiguity into an otherwise plainly worded statute. Instead of tracking § 242's language or alleging that the Execution Team used their firearms for the purpose of facilitating the alleged unlawful search, the Indictment asserts that the "offense involved the use of a dangerous weapon."[47] By using the phrase "offense involved," the Indictment embraces a different and more expansive concept of "use" than

---

[44] *Acosta*, 470 F.3d at 136 n.2 (internal citations omitted).
[45] *Rodella*, 852 Fed. App'x at 329-30 (citations omitted).
[46] USE, Black's Law Dictionary (12th ed. 2024).
[47] Indictment, DN 1 at PageID# 3 (Count One).

the more exacting, and ordinary, active-employment definition. Indeed, "[c]ircuit courts have repeatedly held . . . that the term 'involve' is expansive."[48]

"More broadly, the word requires merely that one item 'relate closely' to the other item."[49] More narrowly, the word requires that one item necessarily include another.[50] Here, the charge shows that the Government relied on the broader meaning of "involve." Count One alleges no more than this: the Execution Team would be armed and Jaynes as well as Meany knew they would be armed. That is, Jaynes and Meany knew guns would be present at the scene and thus would bear a relationship of some sort to the events. According to the Government's Indictment, this is enough to say that the offense included the use of a dangerous weapon. The Court disagrees. Such an expansive interpretation of "use" under § 242 is not supported by the statute's framework or the ordinary meaning of "use," active employment for a purpose. The Government's interpretation fails to account for the possibility that an armed officer can commit a rights-violation without using his gun to achieve that end. The armed officer who wrongly impounds a car, the Second Circuit's example, starkly illustrates the point. An armed sheriff who ejects an eligible voter from a polling station commits a rights-violation, but one cannot seriously argue that his conduct included the type of proscribed weapon-use that § 242 contemplates.

Moreover, should there be any doubt as to what "use" means under § 242, "the tie must go to the defendant[s]."[51] "The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."[52] "This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of

---

[48] *U.S. v. Gould*, 30 F.4th 538, 545 (6th Cir. 2022) (collecting cases).
[49] *Id.* (citations omitted).
[50] *Id.*
[51] *U.S. v. Santos*, 553 U.S. 507, 514 (2008).
[52] *Id.* (citations omitted).

inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead."[53] Because the active-employment definition of "use" is always more favorable to defendants than is the offense-involved definition, the rule of lenity dictates that it should be adopted.

Aside from the officers being armed, the Indictment's only fact allegation about weapons concerns officers' returning K.W.'s gunfire:

> When those officers broke down the door to the apartment, a guest in Taylor's home (K.W.), believing that intruders were breaking in, immediately fired one shot with a handgun that he lawfully possessed, hitting the first officer at the door. Two LMPD officers immediately fired a total of 22 shots into the apartment, and one of those shots hit Breonna Taylor in the chest. A third officer moved from the doorway to the side of the apartment and fired ten more shots through a window and a sliding glass door, both of which were covered with blinds and curtains.[54]

None of these allegations suggests that the officers employed their weapons to facilitate, further, or aid in conducting the search itself. Thus, the Indictment does not allege a prima facie case with respect to the Use Charge.  Although the Government argues that the Execution Team went in with weapons "drawn," it also asserts that they drew their weapons because "executing search warrants is an inherently dangerous practice – especially when done at night."[55]  In other words, the Execution Team's purpose was self-protection, not facilitating the allegedly unlawful search.

The absence of sufficient active-employment allegations means that the Indictment failed to put Jaynes and Meany on fair notice of the statutorily proscribed conduct.[56] Additionally, the Court cannot know if the grand jury passed judgment on this element of the offense. A defendant cannot

---

[53] *Id.*

[54] Indictment, DN 1 at PageID# 2-3 (¶ 9).

[55] Response, DN 40 at PageID# 847.

[56] *Russell v. U.S.*, 369 U.S. 749, 763 (1962) (indictment must include fact allegations sufficient to make prima facie case); *U.S. v. Cruikshank*, 92 U.S. 542, 558 (1875) ("[a] crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances" if the charging document is to comport with the Constitution); U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation [against him.]").

"be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him,"[57] and the Court cannot make presumptions about what the grand jury heard. The Use Charge will be dismissed.[58]

### C. The Second Felony Offense – Taylor's Death (the "Death-Results" Charge)

To state a prima facie case for the Death-Results Charge, the allegations must include facts which show that the warrantless entry was both the actual (but-for) cause[59] and the proximate cause of Taylor's death.[60] First, the former event (warrantless entry) must have caused the latter (Taylor's death); this is actual cause.[61] That is, it must be proven that but for the warrantless entry, Taylor would still be alive. Second, one event is the proximate cause of another only if it has "a sufficient connection to the result."[62] There "must be 'some direct relation between the injury asserted and the injurious conduct alleged.'"[63] The result must be "the natural and probable consequence" of the action at issue,[64] as opposed to a conceivable consequence. Accordingly, in this case, Taylor's death must have been the natural and probable result of the warrantless entry (the lack of probable cause to search) as opposed to an imaginable result.

Further, even if the warrantless entry were the actual and proximate cause of Taylor's death, Jaynes and Meany may be exonerated still if the law deems that an intervening act is the legal

---

[57] *Russell*, 369 U.S. at 770; *Stirone v. U.S.*, 361 U.S. 212, 217 (1960) (court cannot permit defendant to be tried on charges not made in indictment); *accord U.S. v. Ferguson*, 681 F.3d 826, 831 (6th Cir. 2012) (to allow court to guess as to what was in grand jury's minds deprives defendant of basic protection grand jury was designed to secure.).

[58] *Superior Growers*, 982 F.2d at 177 (indictment must assert "facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime."); *U.S. v. Hess*, 124 U.S. 483, 486 (1888) ("[a]ll the material facts and circumstances embraced in the definition of an offense must be stated. No essential element of the crime can be omitted without destroying the whole pleading. The omission cannot be supplied by intendment, or implication, and the charge must be made directly and not inferentially, or by way of recital.").

[59] *Burrage v. U.S.*, 571 U.S. 204, 211 (2014) (but for causation is "minimum requirement for a finding of causation when a crime is defined in terms of conduct causing a particular result.").

[60] *Id.* at 210 (when crime requires "'not merely conduct but also a specified result of conduct,'" defendant generally may not be convicted unless conduct is both actual and proximate cause of result); *U.S. v. Martinez,* 588 F.3d 301, 317-18 (6th Cir. 2009) (noting that § 242 requires proximate cause showing); *see also infra* at § I.C.2.

[61] *Paroline v. U.S.*, 572 U.S. 434, 444 (2014).

[62] *Id.*

[63] *Id.* (citation omitted).

[64] *Milwaukee & St. Paul Ry. Co. v. Kellogg*, 94 U.S. 469, 475 (1876).

cause. To be the legal cause, an intervening act must be the immediate cause of Taylor's death[65] and the law must consider that act sufficient to override the warrantless entry.[66] Stated another way, the intervening act must have altered the natural course of events such that it can fairly be said to have severed the connection between the warrantless entry and Taylor's death.[67] Jaynes and Meany contend that K.W.'s decision to open fire is just such an act, relieving them of criminal responsibility for Taylor's death and requiring dismissal of the Death-Results Charge.[68]

In response, the Government contends that it is not required to prove proximate cause such that Jaynes' and Meany's superseding-cause arguments are wholly misplaced. Alternatively, the Government contends that if it is required to show proximate cause, the question must go to the jury because the pertinent facts are disputed. As for superseding cause, the Government argues that K.W.'s decision to open fire is not necessarily a superseding cause because he did not know he was shooting at police. According to the Government, K.W.'s firing first could be a superseding cause only if he knew it was police when he opened fire.[69]

Based on the fact allegations and the Government's argument, the Court finds that the warrantless entry was not the actual cause of Taylor's death. The Court also concludes that the Death-Results charge requires proof of proximate cause and that allegations in this case show that the warrantless entry was not the proximate cause of Taylor's death and even if it were, K.W.'s decision to open fire is the legal cause of her death, it being a superseding cause. Consequently, the Court will dismiss the Death-Results Charge.

---

[65] CAUSE, Black's Law Dictionary (12th ed. 2024) (defining intervening cause).
[66] *Id.* (defining superseding cause).
[67] *Id.*
[68] Meany's Motion to Dismiss, DN 33 at PageID# 102; Jayne's Motion to Dismiss, DN 35 at PageID# 614.
[69] Response, DN 40 at PageID# 838-41.

### 1. Actual Cause or Cause in Fact

"The traditional way to prove that one event was a factual cause of another is to show that the latter would not have occurred 'but for' the former."[70] Accordingly, the first step is to identify both the result and the alleged cause of that result. Here, the result is Taylor's death, and the alleged cause is a violation of her Fourth Amendment rights. "The Fourth Amendment prohibits 'unreasonable searches and seizures.'"[71] Reasonableness "is always the touchstone of Fourth Amendment analysis.'"[72] A search may be unreasonable because police lacked a valid reason for entry; that is, there was no probable cause, consent or exigent circumstance.[73] A search may also be unreasonable because of the manner of entry. If police are required to knock-and-announce but fail to do so, that failure is a Fourth Amendment violation.[74] A warrantless entry and an unreasonable manner of entry are distinct Fourth Amendment violations.[75] The distinction makes all the difference in this case. The Government has charged a Fourth Amendment violation based only on the alleged warrantless entry: ". . . the officers lacked probable cause for the search."[76] It has not charged that the manner of entry was unreasonable.

Yet, the fact allegations make clear that the Execution Team's post-midnight, startling entry caused K.W. to open fire which, in turn, prompted the return fire which hit and killed Taylor:

> On March 13, 2020, at approximately 12:45 a.m., LMPD officers . . . executed the warrant at Taylor's home. When those officers broke down the door to the apartment, a guest in Taylor's home (K.W.), believing that intruders were breaking in, immediately fired one shot with a handgun that he lawfully possessed, hitting the first officer at the door. Two LMPD officers immediately fired a total of 22 shots into the apartment . . .[77]

---

[70] *Paroline*, 572 U.S. at 449-50.

[71] *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 427 (2017) (citation omitted).

[72] *Id.*

[73] *See Mich. v. Cliffford*, 464 U.S. 287, 293 (1984) (absent consent or exigent circumstances, entry must be made pursuant to a warrant).

[74] *Wilson v. Ark.*, 514 U.S. 927, 931-36 (1995) (knock-and-announce principle forms part of Fourth Amendment reasonableness inquiry).

[75] *Mendez*, 581 U.S. at 431-32.

[76] Indictment, DN 1 at PageID# 2 (¶ 7).

[77] *Id.* at PageID# 2 (¶ 9).

That is, but for the startling entry, K.W. would not have fired his gun. Accordingly, the traditional, but-for test for actual cause is readily met if the underlying event is the manner in which the officers entered. The same is not true if the underlying event is the concurrent warrantless entry.

In criminal law, if *A* intentionally stabs *B*, inflicting a mortal wound while at the same moment, *X* intentionally shoots *B* in the head, also inflicting a mortal wound, and *B* dies from the combined effects of the wounds, *A* is guilty of murder.  Yet, one cannot say that but for *A's* conduct *B* would not have died. As a result, in such concurrent-cause cases, courts have modified the traditional but-for test and asked whether *A's* conduct was a substantial factor in, or contributed to, bringing about *B's* death.[78] Applied to the instant case, the substantial-factor test would permit the conclusion that the warrantless entry was the actual cause of Taylor's death. *Burrage v. United States*[79] precludes such a finding, however.

In *Burrage*, the Supreme Court rejected the contributing factor test. The issue in *Burrage* was whether the defendant, a drug distributor, was subject to § 841(b)(1)(C)'s increased penalty of 20-years-to-life applicable when "death . . . results from the use" of the distributed drug at issue. The drug was heroin. Because the victim had ingested multiple drugs, the Government could prove the heroin contributed to the victim's death but could not prove that but-for the heroin use, the victim would not have died. The Government obtained a conviction on the contributing-factor theory. The Supreme Court reversed, holding that the contributing-factor theory of liability did not satisfy § 841(b)(1)(C)'s "results from" language. The Court ruled that the plain meaning of "results from" imposed "a requirement of but-for causation." Accordingly, Burrage was guilty only if the heroin alone could have brought about the victim's death. The Court ruled that the heroin use must have been a sufficiently independent cause or it must have been the straw that broke the camel's back.

---

[78] 1 WAYNE R. LAFAVE, Substantive Criminal Law, § 6.4(b), Cause in fact, (3d ed. 2023).
[79] 571 U.S. 204 (2014).

Thus, *Burrage* establishes this rule: where concurrent causes of a harm exist, any one of them may be a cause-in-fact but only if it alone could have brought about the harmful result.

This Court sees no principled way to depart from this rationale in the present case. Section 841(b)(1)(C)'s death-results penalty enhancement applies if "death results from" the use of the distributed drug at issue. Section 242's death-results penalty enhancement applies if "death results from" the acts committed in violation of § 242. The syntax and diction are the same. Thus, here, the allegations must show that the warrantless entry alone caused Taylor's death. The fact allegations preclude that finding. If the lack of probable cause is removed from the fact pattern, the events would have played out the same way. Even if police had a valid warrant, the alleged post-midnight, busting in would have frightened K.W. who would have fired, prompting the lethal return fire from the officers. K.W. did not respond to the act of entry without probable cause. He responded to the manner of entry.

Further, commonsense dictates that a midday, announced entry would not cause K.W. to believe he needed to fend off intruders. In fact, the Government takes pains to stress that K.W. fired only because he believed the police were intruders: "when K.W. fired toward Ms. Taylor's doorway, he had no idea that he was shooting at police officers."[80] That is, but-for K.W.'s being frightened into opening fire, Taylor would still be alive. Assuming it was warrantless, the entry constituted a Fourth Amendment violation, but, standing alone, the fact that the entry was invalid was not the actual cause of Taylor's death.

This holding not only comports with traditional notions of but-for causation, it also comports with the aims of § 242. One of those aims is to restrict exposure to life imprisonment or a death sentence to governmental actors who risk someone's life while violating a federally established right. Police brutality and other excessive force cases are ready examples. The instant matter,

---

[80] Response, DN 40 at PageID# 841.

however, is not an excessive force case. To the contrary, the Government expressly noted that "[t]he two officers who immediately returned fire through Ms. Taylor's front door—including the officer who fired the round that killed Ms. Taylor—have not been charged with any crime."[81]

### 2. Proximate Cause

Requiring a proximate cause showing also comports with the purpose of § 242's death-results penalty. Two decisions from the Sixth Circuit: *U.S v. Martinez*[82] and *U.S. v. Jeffries*[83] support this conclusion. Together, *Martinez* and *Jeffries* stand for this proposition: requiring proximate cause makes sense where a death-results penalty enhancement is tied to an underlying offense which may be committed in many ways, some of which carry an inherently foreseeable risk of death and others which do not. Where death is inherently foreseeable, there is little point in requiring proof of proximate cause, according to the Sixth Circuit.[84] However, the same is not true when the penalty enhancement is tied to a crime that may be committed in a way that does not necessarily hazard someone's life. In such cases, proof of proximate cause makes sense:

> In circumstances in which the potential for injury or death is not an inherently foreseeable result of the conduct proscribed . . . , it might make sense to require the government to prove that it was reasonably foreseeable to the defendant that the conduct would be likely to lead to injury or death, *see Martinez*, 588 F.3d at 319, and that the prohibited conduct was the proximate cause of the injury or death.[85]

Thus, in the context of healthcare fraud, to convict the defendant of causing a death, the Government must prove that the fraud was the proximate cause (the *Martinez* holding).[86] By

---

[81] *Id.* at PageID# 834 (n.1).
[82] 588 F.3d 301 (6th Cir. 2009).
[83] 958 F.3d 517 (6th Cir. 2020).
[84] *Jeffries*, 958 F.3d at 524 ("Because death or injury from the use of the substance is inherently foreseeable, there is no need to require the government to prove that they were reasonably foreseeable to the defendant.").
[85] *Id.* at 523.
[86] *Id.* (*Martinez* held that "proximate cause was the appropriate standard to apply in interpreting the phrase 'if the violation results in death.'") (quoting *Martinez*, 588 F.3d at 318-19).

contrast, in a drug case where the enhanced penalty is tied to the use of the narcotic, proximate cause is not required (the *Jeffries* holding).[87]

Given this reasoning, requiring proximate cause with respect to § 242's death-results penalty enhancement makes sense. "[I]n lieu of describing the specific conduct it forbids, [§ 242's] general terms incorporate constitutional law by reference, and many of the incorporated constitutional guarantees are, of course, themselves stated with some catholicity of phrasing."[88] Thus, § 242 does not "delineate the range of forbidden conduct with particularity."[89] Indeed, as explained, it is possible to commit the base offense – a rights-violation, including a constitutional rights violation – without violent means or causing bodily injury or death. That is, one can violate another's constitutional rights without creating the risk that someone may die. Thus, death is not an inherently foreseeable result of violating § 242. In such cases, according to the Sixth Circuit's decision in *Jeffries*, a proximate cause showing makes sense. The Fifth Circuit reached the same conclusion about § 242:

> Can it be seriously argued that a police officer, determined only to extract a confession from a prisoner, who inflicts a fatal wound in the persuasion process, has not committed the type of offense which Section 242 was designed to proscribe? Conversely, can it be seriously argued that a police officer who illegally arrests a person who, on the way to the paddy wagon, is killed by a bolt of lightning has committed the type of offense which the amendment to Section 242 was designed to deter? We think not. Rather, the more severe punishment prescribed for those Section 242 violations resulting in death is clearly designed to deter the type of conduct that creates an unacceptable risk of loss of life.[90]

This Court agrees. Section 242's  harshest penalties – life imprisonment or a death sentence – are meant to deter conduct that "creates an unacceptable risk of loss of life."[91] Not all police conduct

---

[87] *Id.* at 524 ("Because death or injury from the use of the substance is inherently foreseeable, . . . . [i]t therefore makes sense to require the government to prove only but-for causation in order to apply the enhanced penalty.").

[88] *Lanier*, 520 U.S. at 265 (internal citations omitted).

[89] *Id.*

[90] *U.S. v Hayes*, 589 F.2d 811, 821 (5th Cir. 1979).

[91] *Id.*

– even conduct that violates a constitutional right – inherently creates such a risk. True, some wrongful police conduct carries an inherently foreseeable risk of death (beating an arrestee to a pulp), but some does not (wrongly impounding a car). Indeed, an officer should not expect to be fired upon while booting a car much less expect that he cannot return fire without risking life imprisonment or a death sentence. Yet, if § 242 were to demand only but-for causation, such would be the case as but-for wrongly impounding the car, a firefight would not have broken out. There would be no consideration for whether the shooter's conduct was the proximate cause of any harm that resulted from the return fire.

Nonetheless, the Government argues that it need only prove actual cause under § 242, relying on the Supreme Court's decision in *Burrage*[92] and the Sixth Circuit's decision in *Jeffries*.[93] Neither case requires that conclusion. *Burrage* and *Jeffries* both concerned 21 U.S.C. § 841. In *Burrage*, the Supreme Court did not reach a decision as to whether § 841 requires proximate cause. While *Jeffries* did reach the issue and held only actual cause is required in § 841 cases, for the reasons explained earlier, *Jeffries* still warrants the conclusion that § 242 requires proximate cause proof. Again, unlike § 841 cases, violations of § 242 present "circumstances in which the potential for injury or death is not an inherently foreseeable result of the conduct proscribed,"[94] such that proximate cause proof is warranted. This conclusion not only comports with § 242's aims but also with the "fundamental principle of criminal law that a person is held responsible for all consequences proximately caused by his criminal conduct."[95]

Having found that proximate cause is required, the Court now turns to its conclusion that the charged Fourth Amendment violation was not the proximate cause of Taylor's death. The basis of

---

[92] 571 U.S. 204.
[93] 958 F.3d 517.
[94] *Id.* at 523.
[95] *Hayes*, 589 F.2d at 821.

that alleged rights-violation is a lack of probable cause to enter Taylor's apartment. More specifically, the Indictment alleges that Jaynes and Meany each knew that the warrant affidavit, and by commonsense implication, the warrant, "was not supported by probable cause."[96] The Indictment does not allege that Taylor's Fourth Amendment rights were violated for any other reason. Thus, to state a case for the death-results penalty enhancement, the Government must allege facts which, if true, would permit the conclusion that Taylor's death was the natural and probable consequence of the lack of probable cause to enter her apartment. It has not done so.

"Every event has many causes . . . and only some of them are proximate, as the law uses that term. So to say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result."[97] There "must be 'some direct relation between the injury asserted and the injurious conduct alleged.'"[98] At the same time, proximate cause "is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct."[99] Taken together, foreseeability and directness overlap because in "most cases the more directly related an outcome is to an underlying action, the more likely that the outcome will have been foreseeable, and *vice versa*.'"[100] Accordingly, an alleged harm is not "foreseeable" simply because it is a conceivable consequence of some action. Instead, it must be "the natural and probable consequence" of the action at issue.[101]

In the context of constitutional rights, foreseeability/scope-of-risk is defined by the interest that the constitutional right is meant to protect.[102] Here, again, the facts in this case implicate two

---

[96] Indictment, DN 1 at PageID# 3 (Count One); *see also id.* at PageID# (¶ 7).
[97] *Paroline* 572 U.S. at 444.
[98] *Id.* (citation omitted).
[99] *Id.* at 445 (citation omitted).
[100] *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 868 (6th Cir. 2020) (citation omitted).
[101] *Kellogg*, 94 U.S. at 475.
[102] *Carey v. Piphus,* 435 U.S. 247, 259 (1978) (redress under § 1983 should be tailored to protect the interests protected by constitutional right in question). Section 1983 cases apply as the "concept of proximate causation is applicable in both criminal and tort law, and the analysis is parallel in many instances." *Paroline,* 572 U.S. at 444.

sets of interests: (1) those protected by the warrant requirement and (2) those protected by the knock-and-announce rule. The warrant requirement protects "privacy interests."[103] It assures citizens that a search is not an arbitrary, random act by government, "that the intrusion is authorized by law," is narrow in scope, and is supported by a judge's "objective determination" as to cause.[104] By contrast, the knock-and-announce rule is meant to protect "life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident."[105] The interests are different.[106]  Indeed, the risk created by the failure to knock and announce has "nothing to do with whether the Fourth Amendment require[s] the officers to obtain a warrant."[107] Accordingly, while Taylor's death is within the scope of risk created by the failure to knock and announce, it is not within the scope of risk created by the warrantless entry, *i.e.*, by the fact that the officers lacked probable cause to enter. This is the rub for the Government.

The Government has not explained how the lack of probable cause to enter created a foreseeable risk of a gunfire exchange. The Government does not explain how the gunfire was the

---

[103] *Skinner v. Rwy. Labor Executives' Ass'n*, 489 U.S. 602, 621 (1989) ("essential purpose of a warrant requirement is to protect privacy interests").

[104] *Id.* at 622.

[105] *Hudson v. Mich.*, 547 U.S. 586, 594 (2006).

[106] *U.S. v. Smith*, 526 F.3d 306, 311 (6th Cir. 2008) ("interests served by the knock-and-announce rule—protection of life and limb, protection of property and the opportunity to collect oneself before answering the door—'have nothing to do with the seizure of the evidence,' and nothing to do with whether the Fourth Amendment required the officers to obtain a warrant.") (citation omitted); *see also Torres v. Madrid*, 592 U.S. 306, 316 (2021) ("focus of the Fourth Amendment is 'the privacy and security of individuals,' not the particular manner of 'arbitrary invasion[ ] by governmental officials.'") (citation omitted) (alteration in original); *Md. v. Pringle*, 540 U.S. 366, 370 (2003) ("long-prevailing standard of probable cause protects 'citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime'") (quoting *Brinegar v. U.S.*, 338 U.S. 160, 176 (1949)); *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 266 (1990) ("driving force behind the adoption of the [Fourth] Amendment, as suggested by [James] Madison's advocacy, was widespread hostility among the former colonists to the issuance of writs of assistance empowering revenue officers to search suspected places for smuggled goods, and general search warrants permitting the search of private houses, often to uncover papers that might be used to convict persons of libel. The available historical data show, therefore, that the purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own Government . . . .'") (internal citation omitted); *U.S. v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) ("Rather than protect an individual's person, a search warrant 'safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.'") (quoting *Steagald v. U.S.*, 451 U.S. 204, 213 (1981)).

[107] *Smith*, 526 F.3d at 311; *see also U.S. v. Spikes*, 158 F.3d 913, 925 (6th Cir. 1998) (knock-and-announce rule affords "notice to those inside so that they may open the door peaceably and without the needless destruction of property [it also] avoid[s] the possibility of a violent confrontation if those inside mistook the police for intruders.").

natural and probable consequence of lacking a valid warrant. Instead, the Government argues that

the gunfire exchange was a foreseeable result of the late-night, surprise manner of entry:

> . . . the firefight that killed Ms. Taylor was a foreseeable result of sending armed officers to execute an ill-gotten warrant on an unsuspecting household late at night.[108]

> . . . The execution of this warrant foreseeably resulted in a gunfight when an unsuspecting resident (K.W.) fired a shot in self-defense at the moment officers broke down Ms. Taylor's door.[109]

> . . . if the trial evidence proves that K.W. lawfully fired to defend Ms. Taylor's home because he and Ms. Taylor believed (honestly, but mistakenly) that the police were intruders, Ms. Taylor's death would be a foreseeable consequence of the defendants' obtaining a false warrant that they knew would be served by armed officers at night on unsuspecting people.[110]

> . . . The government intends to prove . . . that the defendants . . . knew that heavily armed officers would execute that ill-gotten warrant at Ms. Taylor's home late at night . . . .[111]

The key here is the "late night" surprise, according to the Government. That manner of executing

the warrant created the risk of death, not the lack of a valid warrant. The Government's argument

fails to recognize the distinction, conflating manner-of-entry issues with invalid entries. As such,

its argument is untenable. Indeed, *Cnty. of Los Angeles v. Mendez*, a Supreme Court decision,

instructs that such conflated reasoning misses the mark and constitutes reversible error:

> The [appellate] court reasoned that when officers make a "startling entry" by "barging into" a home "unannounced," it is reasonably foreseeable that violence may result. But this appears to focus solely on the risks foreseeably associated with the failure to knock and announce, which could not serve as the basis for liability since . . . the officers had qualified immunity on that claim. By contrast, the Court of Appeals did not identify the foreseeable risks associated with the *relevant* constitutional violation (the warrantless entry); nor did it explain how, on these facts, respondents' injuries were proximately caused by the warrantless entry. In other words, the Court of Appeals' proximate cause analysis . . . conflated distinct Fourth

---

[108] Response, DN 40 at PageID# 831.
[109] *Id.* at PageID# 832.
[110] *Id.* at PageID# 839.
[111] *Id.* at PageID# 841.

Amendment claims and required only a murky causal link between the warrantless entry and the injuries attributed to it.[112]

Here, the only alleged constitutional violation is a warrantless entry. Yet there are no fact allegations which suggest that Taylor's death was proximately caused by that entry. Nor has the Government explained how, based on the alleged facts, Taylor's death was proximately caused by the lack of probable cause to enter. Instead, the fact allegations and the Government's argument compel the conclusion that Taylor's death was proximately caused by the manner in which the warrant was executed. K.W.'s decision to open fire, as alleged and argued, was the natural and probable consequence of executing the warrant at 12:45 a.m. on "an unsuspecting household." That decision prompted the return fire which hit and killed Taylor.[113]

### 3. Superseding Cause

Even if the warrantless entry were deemed the actual and proximate cause of Taylor's death, the Court would still dismiss the Death-Results Charge. While the Indictment alleges that Jaynes and Meany set off a series of events that ended in Taylor's death, it also alleges that K.W. disrupted those events when he decided to open fire on the Execution Team: "When those officers broke down the door to the apartment, a guest in Taylor's home (K.W.), believing that intruders were breaking in, immediately fired one shot . . . ."[114] Given this allegation, this case presents a broken chain of events. There is no direct link between the warrantless entry and Taylor's death. As a result, the issue becomes whether the law deems K.W.'s decision to shoot first to supersede the warrantless entry such that his conduct became the proximate, or legal, cause of Taylor's death. The Court concludes K.W.'s decision to shoot first did just that.

---

[112] *Mendez*, 581 U.S. at 431–32 (emphasis in original) (cleaned up).
[113] Indictment, DN 1 at PageID# 2-3 (¶¶ 9-10).
[114] *Id.* at PageID# 2 (¶ 9).

The Sixth Circuit's decision in *Estate of Sowards v. City of Trenton*[115] supports this conclusion. In *Sowards,* a § 1983 case, police broke down Sowards' door without probable cause, consent or exigent circumstance – a warrantless entry. After police kicked in the door, they saw Sowards pointing a gun at them and opened fire. Sowards was undeterred and police fired again from a covered position. Sowards died from gunshot wounds. Prior to that, in response to an officer's knocking on his door, Sowards began yelling profanities and slipped a note under his door suggesting that the officer was the devil. Thus, it is unclear if Sowards, a schizophrenic, knew he was pointing his gun at police. The district court held that the illegal entry was not the proximate cause of the shooting; rather it was Sowards' threatening officers with a gun. The Sixth Circuit affirmed: "Sowards' own conduct of pointing the handgun toward the officers was the intervening or superseding cause that set in motion the events that ultimately led to his death."[116]

*Bodine v. Warwick*,[117] on which *Sowards* relied, is also instructive. *Bodine* held that a warrantless entry does not automatically expose the offending officers to liability for bodily harm caused by the officers' subsequent use of force. Rather, if a subject threatens an officer who responds with reasonable force, the officer cannot be liable for any bodily harm because the subject's conduct would constitute a superseding cause.[118] The dispositive factor is the reasonableness of the officer's conduct. Later, in *Lamont v. New Jersey*, the Third Circuit said as much, explaining that *Bodine* stands for this proposition: "as long as 'the officer['s] use of force was reasonable given the plaintiff's acts, then despite the illegal entry, the plaintiff's own conduct would be a [superseding] cause that limited the officer['s] liability.'"[119]

---

[115] 125 Fed. App'x 31 (6th Cir. 2005) (unpublished).
[116] *Id.* at 42.
[117] 72 F.3d 393 (3d Cir. 1995).
[118] *Id.* at 400.
[119] 637 F.3d 177, 186 (3d Cir. 2011) (citations omitted) (alterations in original).

The Government has a different view. It contends that the dispositive factor is whether the shooter recognizes that he is confronting police.[120] The Government cites *Kane v. Lewis*,[121] a Fourth Circuit § 1983 case based on a failure to knock and announce theory. However, *Kane* ultimately does not help the Government. In *Kane*, the police encounter resulted in the death of Andrew Cornish, plaintiff Kane's father. After police entered Cornish's home, he advanced toward them with a knife. The Fourth Circuit found that given the logistics, Cornish must have known he faced police but chose to advance on them anyway, making his attack the superseding cause of his death.[122] At the same time, the court put it this way: "In other words, the Officers' illegal entry was not the legal cause of Cornish's death; rather he was 'killed as a direct result of trying to stab a police officer.'"[123] That is, Cornish's death was the natural and probable consequence of his attempt to stab a police officer, an intervening act which bore the most direct relationship to Cornish's death.[124] Thus, Cornish's own conduct superseded the illegal entry and became the legal cause of his death. This conclusion epitomizes proximate and superseding cause analysis.

This reasoning also comports with the Restatement (Third)'s definition of superseding cause. The Restatement states that a "'superseding cause' is an intervening force or act that is deemed sufficient to prevent liability for an actor whose tortious conduct was a factual cause of harm. The 'act' may be tortious or entirely innocent."[125] That is, superseding-cause analysis does not turn on the culpability of the intervening actor. Rather, it turns on what conduct bears the most direct

---

[120] Response, DN 40 at PageID# 839-40. (if resident "shoots at police officers *knowing that they are law enforcement*, then the resident's conduct is likely to be an intervening act that breaks the chain of causation" but where resident "*does not know* that the intruders are police . . . his action in firing at the apparent intruders does not break the causal chain because it is foreseeable.") (emphasis in original).

[121] 604 Fed. App'x 229 (4th Cir. 2015) (unpublished).

[122] *Id.* at 237.

[123] *Id.* (citations omitted).

[124] *Paroline*, 572 U.S. at 444 (to be proximate cause, act must have direct relation to injury).

[125] RESTATEMENT (THIRD) OF TORTS: Phys. & Emot. Harm § 34 (2010).

relationship to the harm. Thus, whether K.W. knew he was firing at police does not determine whether his decision to shoot first was a superseding cause of Taylor's death.

*Whitlow v. City of Louisville*,[126] a Sixth Circuit case on which Jaynes and Meany rely, supports this conclusion. Police fatally wounded Robert Whitlow during a S.W.A.T. team's execution of a search warrant. Whitlow ignored an officer's command that Whitlow drop his gun and raised it at the officer instead. Plaintiff, Whitlow's personal representative, sued under § 1983, claiming that police were negligent or reckless in their investigation and risk assessment which led to the unreasonable use of a SWAT team and surprise tactics. It was those tactics, plaintiff claimed, that caused Whitlow's death.[127] Whitlow could not be the cause of his own death, according to the plaintiff, because he "likely [had] no idea who was confronting him."[128] The Sixth Circuit rejected those arguments:

> . . . Estes ordered Whitlow to drop his gun, but according to the officer, he raised it instead and pointed it directly at Estes. Therefore, any negligence on the officers' part in completing the Matrix, such that the S.W.A.T. Team was not required to execute the warrant, was not the proximate cause of Whitlow's injury. Rather, it was his pointing the gun directly at Estes.[129]

Again, the suspect's surprise or his unwittingly threatening police is not dispositive of proximate cause. Here, all parties agree that K.W. not only raised his weapon, he fired it and fired first. On these alleged facts, the Court concludes that K.W.'s opening fire was the proximate cause of Taylor's death, it being a superseding cause.

Title 18, United States Code, § 242 is meant to deter governmental actors from violating federally established rights, including constitutional rights. Congress deemed it fit to make such an offense a misdemeanor. It is only when a rights-violation is furthered by a governmental actor's use of violent means and/or when a rights-violation causes bodily injury or death that the harsher

---

[126] 39 Fed. App'x 297 (6th Cir. 2002) (unpublished).
[127] *Whitlow*, 39 Fed. App'x at 301.
[128] *Id.* at 307-08.
[129] *Id.* at 308.

penalties, the felonies, come into play. This Court's duty is "to apply the law as it is written" and to go no further.[130] The tragedy of Breonna Taylor's death and the gravity of her family's grief are not lost on this Court. However, "the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment."[131] In this case, the alleged facts do not fit the § 242 felony offenses as written. The Execution Team did not use their weapons to subject Taylor to a search, and their return fire was not the proximate cause of Taylor's death. The felony charges against Jaynes and Meany will be dismissed.

## II. Count Two – Conspiracy To Falsify Records and Witness Tampering

Count Two charges Jaynes with conspiracy to violate 18 U.S.C. §§ 1512(b)(3) and 1519.[132] These are obstruction of justice crimes. Section 1512(b)(3) makes it a crime to tamper with a witness, victim, or informant, and § 1519 makes it a crime to falsify a record in connection with a federal investigation. Violations of these statutes are punishable by up to 20 years' imprisonment.

Jaynes has moved to dismiss Count Two on the ground that it is duplicitous. He contends that by including violations of both statutes, Count Two "sets forth two separate and distinct crimes in one count."[133] The Court disagrees. A charge is duplicitous when it charges two or more distinct offenses in a single count.[134] However, the "allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects.'"[135] Here, Jaynes is charged with reaching an agreement with "K.G." (conspiring) to

---

[130] *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 730 (2021) (Kagan, Breyer and Sotomayor, JJ., dissenting).
[131] *U.S. v. Wiltberger*, 18 U.S. 76, 95 (1820).
[132] Indictment, DN 1 at PageID# 4-5. Count Two also invokes 18 U.S.C. § 371 which criminalizes conspiracies to commit any offense against the United States or to defraud a United States agency.
[133] Motion, DN 36 at PageID# 657.
[134] *U.S. v. Wms.*, 998 F.3d 716, 734 (6th Cir. 2021).
[135] *Braverman v. U.S.*, 317 U.S. 49, 54 (1942); (quoting *Frohwerk v. U.S.*, 249 U.S. 204, 210 (1919)); *accord U.S. v. Vichitvongsa,* 819 F.3d 260, 273 (6th Cir. 2016) (single agreement to commit several crimes is one conspiracy).

both falsify a document and to lie to criminal investigators (the objects of the conspiracy).[136] This is a dual object conspiracy charge, as the Government has aptly shown. Jaynes has not shown otherwise. He did not file a reply and his Motion does not show how the charge is duplicitous. Instead, he devotes the bulk of his Motion to an explanation of anticipated evidence which he believes will controvert the Government's case.[137] As such, his argument is improper at this dismissal stage.[138] Even Jaynes appears to recognize this error, acknowledging that his "challenge to the evidence is a matter which is ***not*** subject to a motion to dismiss . . . ."[139] Jaynes' Motion to Dismiss Count Two (DN 36) will be denied.

### III. Count Three – Falsification of Records in a Federal Investigation

Count Three also charges Jaynes with a violation of § 1519, based on the May 1, 2020 Investigative Letter, as follows:

> On or about May 1, 2020, . . . **JOSHUA JAYNES** falsified an Investigative Letter, which he knew would be used in a criminal investigation into the preparation and execution of the Springfield Drive warrant at Breonna Taylor's home, by including false and misleading statements about the connection between Taylor and alleged drug trafficking, and by omitting material information that undermined the claim of an ongoing connection.[140]

Jaynes argues that this Count should be dismissed because the May 1, 2020 letter is immaterial and because the charge "is not supported by the government's extensive investigation."[141] Section 1519, however, does not contain a materiality element. Section 1519 states, in pertinent part:

> Whoever knowingly . . . falsifies . . . any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any

---

[136] Indictment, DN 1 at PageID# 4 (Count Two).
[137] Motion, DN 36 at PageID# 657-63.
[138] *Landham*, 251 F.3d at 1080 (at dismissal stage, courts do not evaluate evidence on which indictment rests).
[139] Motion, DN 36 at PageID# 658 (n.1) (emphasis added).
[140] Indictment, DN 1 at PageID# 7-8 (Count Three).
[141] Motion, DN 37 at PageID# 752. The second argument is an improper challenge to the evidence.

> department or agency of the United States . . . shall be fined under this title,
> imprisoned not more than 20 years, or both.[142]

The statute's plain language is clear and reveals no materiality requirement. A § 1519 offense has three elements. The Government must prove beyond a reasonable doubt that Jaynes (1) falsified a document which (2) related to a "matter within the jurisdiction of any department or agency of the United States" with (3) "the intent to impede, obstruct, or influence" the federal investigation.[143] Here, that means that a jury must find that Jaynes knowingly falsified the May 1, 2020 Investigative Letter with the intent to impede a federal investigation. No more is required.[144]

Jaynes recognizes that § 1519 does not contain a materiality element, and so he invites the Court to read such a requirement into the statute and to dismiss on that ground.[145] The Court declines to write in an element which Congress did not enact: "'In all cases of statutory construction, the starting point is the language employed by Congress. Where the statute's language is plain, the sole function of the courts is [to] enforce it according to its terms.'"[146] Here, the statutory language is plain. Jaynes' Motion to Dismiss Count Three (DN 42) will be denied.

### IV. Count Four – False Statement to Federal Investigators

Count Four charges Meany with a violation of 18 U.S.C. § 1001. Violations of § 1001 are punishable by up to 5 years' imprisonment. The Indictment alleges that Meany lied when he told an FBI agent that "officers on LMPD's SWAT unit had, during a planning meeting on or about March 5, 2020, asked for no-knock authority" with respect to the search warrant for Taylor's apartment.[147] Meany contends that this alleged lie is immaterial and Count Four must be dismissed for this reason. It is immaterial, says Meany, because when they executed the warrant, officers

---

[142] 18 U.S.C. § 1519.
[143] *Id.*; *U.S. v. Schmeltz*, 667 F.3d 685, 687-88 (6th Cir. 2011).
[144] *Id.*
[145] Motion, DN 37 at PageID# 761 (materiality provision should be "written into" § 1519).
[146] *U.S. v. Calor*, 340 F.3d 428, 431 (6th Cir. 2003) (quoting *Vergos v. Gregg's Enters., Inc.*, 159 F.3d, 989, 990 (6th Cir. 1998)).
[147] Indictment, DN 1 at PageID# 8 (Count Four).

knocked and announced – a fact which Meany contends is undisputed.[148] Meany also contends that "[e]ven if the alleged statement were material, dismissal is still appropriate because there is insufficient evidence to convict [him] of this charge."[149]

Meany's challenge to the evidence is not a ground on which this Court may properly dismiss.[150] As for his assertion that the alleged lie is immaterial as matter of law, materiality is an element of § 1001 but it must be decided by the jury.[151] The jury must decide the issue because a materiality determination "requires applying the legal standard of materiality" to "historical facts."[152] That is, materiality is a mixed question of law and fact and "peculiarly one for the trier of fact."[153]

Nevertheless, Meany seeks to persuade this Court that "[t]here was no tendency for Meany's alleged statement to have influenced the FBI because the warrant was not executed pursuant to the no-knock authority within it, and the FBI knew that long before it interviewed Meany."[154] Meany also challenges exactly what statement was made here.[155] These arguments require findings of facts on matters of proof. As the Supreme Court has explained, such materiality inquiries involve "delicate assessments of the inferences a reasonable decisionmaker would draw from a given set of facts and the significance of those inferences . . . ."[156] This Court cannot properly resolve them on a motion to dismiss. Meany is free to challenge the evidence and make his arguments at trial. In the meantime, Meany's Motion to Dismiss Count Four (DN 34) will be denied.

---

[148] Motion, DN 34 at PageID# 113.
[149] *Id.* at PageID# 118.
[150] *Landham*, 251 F.3d at 1080 (at dismissal stage, courts do not evaluate evidence on which indictment rests).
[151] *Gaudin*, 515 U.S. at 512.
[152] *Id.*
[153] *Id.* (cleaned up) (citation omitted).
[154] Motion, DN 34 at PageID# 119-20.
[155] *Id.* at PageID# 121-24.
[156] *Gaudin*, 515 U.S. at 512 (cleaned up) (citation omitted).

## ORDER

For the reasons set out herein:

1.   Defendant Kyle Meany's Partial Motion to Dismiss Count 1 **(DN 33)** is **GRANTED**.  The final sentence of Count One of the Indictment is hereby **STRICKEN** and the felony charges against defendant Meany as found in Count One of the Indictment are hereby by **DISMISSED without prejudice**.

2.   Defendant Kyle Meany's Motion to Dismiss Count 4 **(DN 34)** is **DENIED**.

3.   Defendant Joshua Jaynes' Motion to Dismiss Count I **(DN 35)** is **GRANTED in part** and **DENIED in part.**  To the extent Jaynes seeks dismissal of the felony changes in Count One, his Motion **(DN 35)** is **GRANTED** but to the extent that he seeks complete dismissal of Count One, his Motion **(DN 35)** is **DENIED**.  Accordingly, the final sentence of Count One of the Indictment is hereby **STRICKEN** and the felony charges against defendant Jaynes as found in Count One of the Indictment are hereby by **DISMISSED without prejudice**.

4.   Defendant Joshua Jaynes' Motion to Dismiss Count II **(DN 36)** is **DENIED**.

5.   Defendant Joshua Jaynes' Motion to Dismiss Count III **(DN 37)** is **DENIED**.

**IT IS SO ORDERED**.

August 22, 2024

**Charles R. Simpson III, Senior Judge**
**United States District Court**